**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **NANCY FOURRE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **V.** | ) | |
| | ) | |
| **REVSPRING, INC.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

### PARTIES TO THIS ACTION

1.      Plaintiff Nancy Fourre ("Plaintiff") is a citizen and current resident of Boone County, Kentucky and was employed by Defendant RevSpring, Inc. ("Defendant") or its predecessor companies from August 2012 until September 2020.

2.      At all times relevant hereto, Plaintiff resided at 3052 Ace Wintermeyer Drive, La Vergne, Davidson County, Tennessee.

3.      Defendant RevSpring, Inc. ("Defendant") is a corporation organized under the laws of the state of Delaware and doing business in the State of Tennessee.

4.      Defendant's principal place of business is 38705 7 Mile Road, Suite 450, Livonia, MI 48152-3979.

5.      Defendant can be served by delivering a copy of the summons and complaint to CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367.

8. Venue in this matter is proper under 28 U.S.C. § 1391.

9. This is an action for unlawful employment practices brought under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. and for retaliatory discharge pursuant to Tennessee state law, specifically Tenn. Code Ann. § 50-1-801, et seq.

**FACTS**

10. Plaintiff incorporates by reference paragraphs 1 through 9 as though fully set forth herein at length.

11. Defendant provides revenue acceleration and accounts receivable management software solutions nationwide, offering data analytics and multi-channel customer communications. Defendant specializes in supply chain management, fleet management and dedicated transportation management.

12. Plaintiff began working for Defendant (previously known as Letter Logic) in August 2012 as a full-time mail specialist earning $13.00/hour, with annual raises.

13. At that time, Plaintiff worked at Defendant's facility located at 1209 Fourth Avenue South, Nashville, TN 37210.

14. Plaintiff last worked at Defendant's facility located at 4640 Cummings Park Drive, Antioch, TN 37013.

15. Plaintiff's job was to operate the inserter machine (Bell & Howell inserter machine #5). This process involves placing billing statements into the machine, after which the machine folds them, inserts them into an envelope and seals the envelope for mailing.

16. Defendant's is a 24-hour operation.

17.     Plaintiff had no difficulty operating the Bell & Howell #5 inserter machine.

18.     Upon information and belief, Letter Logic was purchased in or around September 2016 by Apex Print Technology, LLC.  Plaintiff's job did not change but her title changed to insert operator.  The name of the business remained Letter Logic at that time.

19.     Near the end of 2017 Apex purchased new inserter machines (aka Pitney Bowes FPS #1).  Plaintiff trained on and began operating the FPS #1.

20.     Plaintiff had no difficulty operating the FPS #1.

21.     In or around January 2018 the operation relocated to a different plant, located at 4640 Cummings Park Drive, Antioch, TN 37013, and the company named changed to Apex.

22.     Plaintiff's hourly wage in 2018 was $18.39.

23.     In or around the spring of 2018 Apex purchased a new, high-speed inserter known as the "MPS."  The MPS was at least 2 to 3 inches taller than the other inserter that Plaintiff operated.

24.     Plaintiff was asked to become the first shift operator on the MPS.  She trained on the MPS for approximately one week.  During that time the FPS #1 remained unused.

25.     Because of her height and the size of the machine, Plaintiff had to lift her arms above shoulder height to operate the MPS.

26.     During the first week of operating the MPS Plaintiff's shoulders and arms were very stiff.  Plaintiff took non-prescription medication and worked through the pain.

27.     By the second week Plaintiff was unable to lift her left arm above her shoulder due to pain and burning in her shoulder and shoulder blade.

28.     By the third week of operating the MPS the pain in Plaintiff's left shoulder was constant and was preventing her from sleeping at night.

29.     Plaintiff advised her supervisor, as well as his supervisor, Chris Schoenwalder – Director of Production and Facilities, that the MPS had injured her shoulder and she was in severe and constant pain from operating it.  She stated that she needed to step down from it and return to operating the inserter.

30.     Plaintiff's supervisors advised in essence that Plaintiff was leaving the company short-handed without anyone to operate the MPS and that they would need time to find a replacement operator.

31.     Despite her injury and severe pain, Plaintiff agreed to continue operating the MPS for the duration of that week and for the next week so that her supervisors could find someone.

32.     By that time, Plaintiff's left arm and shoulder were in constant pain and her neck was so stiff that she was unable to turn her head to either side or touch her chin to her chest without severe pain.  She advised Defendant of this.

33.     In addition, Plaintiff was experiencing periodic numbness in her left pinky finger.

34.     Defendant put another operator on the MPS.

35.     Plaintiff began receiving treatment several times per week at Rock Springs Family Chiropractic.

36.     Plaintiff returned to operating the FPS #1 inserter machine.  As long as she did not raise her arm to shoulder level, Plaintiff could tolerate the pain.  She continued to work her regular schedule and did not miss any days of work.

37.     Plaintiff received treatment until approximately October 25, 2018, at which point the pain in her neck had resolved and she was able to move her head side-to-side and up and down.

38.     The pain in Plaintiff's left arm and shoulder was reduced.

39.     In or around November 2018 Plaintiff began receiving treatment at Tennessee Chiropractic Alliance ("TCA").

40.     Plaintiff's left arm and shoulder were eventually pain-free.  By February 2019 she was able to sleep on her left side and stomach which she could not do previously.  She was also able to raise her left arm 180 degrees to a position straight above her head.  Plaintiff was still operating the FPS #1.

41.     In or around April 2019 the company began operating as RevSpring.

42.     Plaintiff remained working in the same facility.

43.     Plaintiff's hourly wage in 2019 was $18.85/hour.

44.     Sometime in 2019 RevSpring purchased a second high-speed inserter machine ("EPIC").

45.     Defendant asked Plaintiff and another employee to be back-up operators on the EPIC high speed inserter machine.  Plaintiff advised she did not think she could operate the machine due to her prior shoulder injury.  Her supervisor stated he thought it would be ok because the stacker on the EPIC was lower than on the MPS.

46.     Plaintiff advised she could not guarantee she would be able to do it.

47.     Her supervisor advised it would only be for 4 hours on Thursday and Friday if those days' work came in.  Otherwise, he said, she could operate her regular inserter machine.

48.     Plaintiff advised she would try but if operating the EPIC machine aggravated her shoulder injury, she would have to step away from it.  Her supervisor nodded that he understood.

49.     In mid-April 2020 Defendant began operating on shortened shifts due to the Covid-19 pandemic.  However, all employees on Plaintiff's shift were still working.

50.     Starting on or around April 21, 2020 Plaintiff trained on the EPIC machine for 2 days the first week.  Her left arm and shoulder became stiff but were otherwise alright.

51.     During the second week Plaintiff trained on the EPIC machine for 2 more days and was then asked to operate it a third day, which she agreed to try.  Her left arm and shoulder remained stiff but were still otherwise alright.

52.     During the third week Plaintiff trained on the EPIC machine for 1 day and then operated it alone for 2 days.  Her left arm and shoulder were uncomfortable by the end of those three days, but she was able to manage.  When she was able to rest after that third day her arm and shoulder improved.

53.     During the fourth and fifth weeks Plaintiff operated the EPIC machine on three days each week.  Once again, her left arm and shoulder became stiff and uncomfortable.

54.     Plaintiff worked as part of a volunteer crew on Memorial Day 2020 during which time she was asked to operate the EPIC machine.  Her left arm and shoulder were stiff and uncomfortable but otherwise alright.

55.     On Monday, June 29, 2020 Plaintiff was directed to operate the EPIC machine for the week because someone was on vacation.  After the first two days her left arm and shoulder were stiff and uncomfortable.  By mid-day on the third day Plaintiff's shoulder started feeling like a hot poker was going through it.

56.     Plaintiff reported to her line lead that her shoulder was causing her pain and she did not believe she could operate the machine.  He had no response.

57.     The next morning before work Plaintiff again told her line lead that her injury was flaring up again and she was in pain.  Again he had no response.

58.     Later that morning Plaintiff went to her supervisor's office and reported that her injury had flared up from operating the EPIC machine ad that she would not be able to operate it full-time.  She stated that once she could get the pain under control again, she would be willing to operate it periodically if needed if she could do it without pain.  Nevertheless, she had to continue operating the EPIC.

59.     The next day Plaintiff operated the EPIC again and was in severe pain all day and that evening.

60.     Thereafter Plaintiff received additional treatment.

61.     When the vacationing employee returned the following week, Plaintiff went back to operating the FPS #1.  Defendant was no longer operating on shortened hours.

62.     On July 27, 2020 Plaintiff's line lead told her that she had to operate the EPIC machine because someone was out sick.  Plaintiff advised the machine causes her too much pain and asked if she had to operate it.  Her line lead nodded his head yes.  Plaintiff operated the EPIC machine until her supervisor arrived at work.  She went to her supervisor's office to tell him that she cannot operate the EPIC machine anymore.  Her supervisor stated that hopefully the employee who was out sick would return the next day.

63.     On July 28, 2020 Plaintiff's line lead advised the aforementioned employee was still out sick but he permitted Plaintiff to operate the FPS #1 while he operated the EPIC.

64.     Later the same morning Plaintiff's supervisor advised the sick employee would be out for the remainder of the week but said that she could operate the FPS #1 for the week.

65.     On the morning of July 30, 2020 Plaintiff's line lead advised her that Plaintiff's supervisor had texted him to advise that he wanted Plaintiff to operate the EPIC machine.  Plaintiff

questioned why she had to operate it. Her line lead responded that he would leave it to her and the supervisor to hash out.

66.     Later that morning Plaintiff went to her supervisor's office and advised that her injury is causing her pain and asked whether she had to operate the EPIC machine. Her supervisor stated, "yes." He then stated he was going to come and get Plaintiff for a meeting with him and Chris Schoenwalder regarding Plaintiff's "refusal to cross train" and stated her line lead had complained that she is being "argumentative."

67.     Shortly thereafter Plaintiff's supervisor came to get her at the EPIC machine for a meeting in the conference room. Chris Schoenwalder was present via audio. She asked Plaintiff why Plaintiff was refusing to cross-train. Plaintiff stated she was not refusing to cross-train and she has in fact cross-trained. She stated she just cannot operate the EPIC because the ergonomics of it cause her severe physical pain.

68.     Chris Schoenwalder asked Plaintiff what could be done in order for her to be able to operate it. Plaintiff replied that she did not know what could be done but she could not do it without aggravating her injury. Ms. Schoenwalder then stated, "What injury? Did you fall? Did you cut yourself?"

69.     Chris Schoenwalder then told Plaintiff to take a few days and figure out what she can do to be able to operate the EPIC machine.

70.     When the meeting was over Plaintiff's supervisor stated, "I have managers above me too." He suggested Plaintiff operate the machine slower or use a step. Plaintiff agreed a step might work but her supervisor then said it would be a trip hazard and couldn't be done.

71.     Plaintiff suggested that another operater operate the EPIC machine, as there was one extra operator. Her supervisor rejected the idea.

72.     The next morning the third shift supervisor told Plaintiff to operate the EPIC machine.  Plaintiff operated it until her supervisor arrived at work, at which point she provided him with a letter from her chiropractor stating she is unable to operate a machine that requires her to put her arms above shoulder height.

73.     At around 9:00 a.m. Plaintiff was summoned to the conference room where Chris Schoenwalder and Human Resources were on Skype.  Plaintiff was advised she was being placed on leave for her safety and the company's safety.  Plaintiff advised she is fully capable of operating the FPS #1 and it is only the EPIC that aggravates her injury.

74.     Plaintiff's supervisor then asked, "what injury?"  Plaintiff reminded the group that she had advised two years before that her arm and shoulder were injured from operating the MPS.  Plaintiff questioned why the initial injury was not a worker's compensation injury.

75.     Plaintiff was advised to leave the premises and required to hand over her employee badge.

76.     On August 7, 2020 Plaintiff was contacted by an insurance company to open a worker's compensation claim.

77.     Plaintiff selected a physician from the list provided by Defendant's insurance carrier.  Plaintiff was directed to see a different physician than the one she had selected, although both were from the same practice.

78.     The aforementioned physician examined Plaintiff on August 13, 2020.  Although he recommended to Plaintiff that she not perform any tasks that require her to raise her arm to shoulder height or above, he advised Plaintiff that he could not give her restrictions and that she could return to work full-time with no restrictions.

79. The same day Plaintiff received the last treatment for her injury. She was released to return to work with restriction from performing tasks that require her to work at or above shoulder height.

80. Five days later, on August 18, 2020, Plaintiff was advised she was being placed on temporary furlough due to a decline in print volume.

81. On September 22, 2020 Plaintiff was advised that her employment was being terminated.

## COUNT I
## FAMILY MEDICAL LEAVE ACT
### (Interference and Retaliation)
### 29 U.S.C. § 2601 et seq.

82. Plaintiff incorporates by reference paragraphs 1 through 80 as though fully set forth herein at length.

83. On or about July 31, 2020 Defendant provided Plaintiff with a Notice of Eligibility and Rights & Responsibilities under the FMLA.

84. Plaintiff promptly provided Defendant with the Certification of Health Care Provider under the FMLA, signed by her physician on August 7, 2020.

85. Defendant provided Plaintiff with a Designation Notice of approved leave under the FMLA for her own serious health condition on August 15, 2020.

86. Three (3) days later, on August 18, 2020, Defendant placed Plaintiff on unpaid furlough.

87. Less than thirty (30) days later, on September 22, 2020, Defendant terminated Plaintiff's employment.

88. Defendant is an employer as defined under the FMLA, 29 U.S.C. § 2611(4)(A)(i) and was Plaintiff's employer at all relevant times.

89.     At all material times, Plaintiff was an eligible employee as defined under the FMLA, 29 U.S.C. § 2611(2)(A)(i) and (ii).

90.     Plaintiff suffered from a serious health condition as defined under the FMLA and was entitled to receive FMLA leave to care for her condition.

91.     Defendant was provided with the requisite notice of the need for leave.

92.     Defendant interfered with Plaintiff's right to exercise her rights under the FMLA by placing her on furlough and terminating her employment.

93.     Defendant unlawfully discharged Plaintiff in violation of her rights under the FMLA.

94.     Defendant retaliated against Plaintiff by placing her on furlough and terminating her employment as a result of exercising her rights under the FMLA.

95.     Defendant's actions constitute interference and retaliation under the FMLA.

96.     Defendant knew or should have known that its conduct violated federal law.

97.     As a result of Defendants' actions, Plaintiff is entitled to recover damages.


## COUNT II
## RETALIATORY DISCHARGE
### Tenn. Code Ann. § 50-1-304 et seq.

98.     Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein at length.

99.     Plaintiff avers that she suffered a compensable injury to her left arm, shoulder and neck from operating the MPS high-speed inserter machine in 2018.

100.    Although Plaintiff reported the injury to the Defendant, the Defendant never acknowledged it and did not file a worker's compensation claim.

101.     Defendant repeatedly required Plaintiff to operate the equipment that caused her initial injury, or similar equipment, despite her protestations and requests not to operate it.

102.     Plaintiff received treatment for her injury periodically from 2018 through 2020.

103.     Defendant pretended not to know of Plaintiff's injury until on or about July 31, 2020, at which time Defendant advised Plaintiff it was "sending [her] home on leave" and required her to turn in her company identification badge.  At that time Defendant also opened a worker's compensation claim.

104.     Defendant advised the panel physician that it could not accommodate restrictions or modifications of any kind before he even examined Plaintiff.

105.     The panel physician therefore returned Plaintiff to work full-duty with no restrictions.

106.     Plaintiff's physician agreed Plaintiff could return to work full-time but would be restricted from raising her arms to shoulder height or above.

107.     Plaintiff exercised her rights under Tenn. Code Ann. § 50-6-101, et seq.

108.     Defendant retaliated against Plaintiff by terminating her employment for exercising her rights, in violation of Tenn. Code Ann. § 50-1-801, et seq.

109.     Plaintiff's claim for worker's compensation benefits was a substantial factor in the Defendant's motivation to terminate Plaintiff's employment.

110.     The reasons asserted by Defendant for Plaintiff's termination were a pretext for retaliation.

111.     As a proximate result of Defendant's retaliatory, unlawful and/or wrongful termination of Plaintiff, Plaintiff is entitled to recover damages.

**WHEREFORE,** Plaintiff respectfully prays for relief as follows:

1. Proper process to issue and for Defendant to be served with a copy of this Complaint and be required to answer it within the time prescribed by law;

2. A jury to try this cause;

3. A monetary judgment in favor of the Plaintiff and against the Defendant;

4. Compensatory damages;

5. Liquidated damages;

6. Costs, including discretionary and court costs;

7. Attorney's fees;

8. Back pay and benefits;

9. Front pay and benefits;

10. Equitable relief, including reinstatement;

11. Punitive damages;

12. Prejudgment interest and, if applicable, post-judgment interest; and

13. Such other legal or equitable relief to which she may be entitled.

**SUE PALMER & ASSOCIATES PLLC**

By:     /s/ *SMPalmer*
          Susan M. Palmer
          P.O. Box 219
          Franklin, TN 37064
          (615) 927-0498
          (610) 592-0055 (Fax)
          sue@suepalmerlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 16th day of September 2021, a true and correct copy of the foregoing has been filed with the Court via the ECF filing system, with service to be made upon the defendant as follows:

Via registered mail return receipt:

CT Corporation System
300 Montvue Road
Knoxville, TN 37919-5546

**SUE PALMER & ASSOCIATES PLLC**

_____*/s/SMPalmer*_____
Susan M. Palmer, BPR #31607
P.O. Box 219
Franklin, TN 37605
(615) 927-0498
(610) 592-0055 (Fax)
sue@suepalmerlaw.com
*Attorneys for Plaintiff*